Case number 24-5874, USA v. Jaquan Bridges. Oral argument, 15 minutes per side. Mr. Gookin for the appellant. Good morning, Your Honor. May it please the Court, Greg Gookin from the Federal Defender's Office. For Mr. Bridges, I would like to reserve five minutes if I could. Very well. Thank you. The District Court judge erred in this case in his order that found that Mr. Bridges did not successfully bring a facial challenge to 18 U.S.C. 922-0. Also, Judge Foulkes erred in finding that an as-applied challenge was also unsuccessful by Mr. Bridges. Mr. Bridges had no prior criminal history, no convictions. He was not prohibited from possessing a firearm under normal circumstances, so thus the charge was 922-0, possession of a machine gun. First, as far as his facial challenge, we have cited and discussed in our brief Bruin and Heller and cases of that ilk to show that Can I ask you a question about the burden on a facial challenge? So there's language that says the defendant has to establish that there's basically no constitutional application. But then in Rahimi, the Court says that means that to prevail, the government need only demonstrate that the provision is constitutional in some of its applications. So does the government have to show that there's an application that's constitutional, or is it still your burden to show that it's unconstitutional in all applications? I believe that it's the government's burden, particularly in a criminal case, where you would have to show that in light of Bruin that a lot of these prior cases have now been sort of turned on their heads. So I think the government would have to show that. I don't think it would be our burden to show that we – I guess it would not be our burden to show anything. It would be the government's burden, since they brought the criminal charges against Mr. Bridges in this case. So we feel that would be the appropriate, I guess, standard for the Court to hold the government to. But as far as, in this case, with a facial challenge, it's not that Mr. Bridges was – or, excuse me, if I could go back to the – as applied to Mr. Bridges, and I'll circle back. For Mr. Bridges, who had no prior criminal record, he does not have any other prohibitions against possessing a firearm. So I don't think that the government has demonstrated – I don't think Judge Foulkes was correct in his analysis of that. I think that he should be able to possess a machine gun. The issue, of course, came about because of the conduct. You know, that's the charge. It's not just the possession. It's that he fired a machine gun, fired several shots. But the statute just prohibits possession, right? Yes. It's really a two-element test. It's that defendant and possess the machine gun. Right. Isn't your better argument that it's a mere possession that's criminalized and that's problematic? It is. I mean, if you start getting into his conduct, you have a problem, right? We do.  It's not – I mean, we're just – we're just focused on the possession of a machine gun, right? So I guess the question is why doesn't our prior precedent take care of it, right, the Hamblin case? Yes, Your Honor. Well, Hamblin was, of course, decided before Bruin. And so, therefore, when you're looking now at what Bruin has stated, which is you have to look at the historical analogs, and that I don't think it's been shown that the government's brief and other cases – I mean, we have two cases. So we have the Williams case where the court doesn't – does a new analysis in light of Bruin, right? Correct. We have the Risner case where we didn't, that we just kind of went with the older precedent. So I guess what is your reading of those two cases, and why is it that we should – that we should go with the – I guess it's Williams and reexamine kind of the historical analogs and all of the things that we're supposed to do under Bruin and Rahimi? I think that since the Supreme Court has said this is what has to be done, that is what the court should do in the case. I think the court has to apply Bruin as it stands now, even with Williams, which says that presumptively people can be dispossessed of handguns or certain types of weapons based upon – in Williams it really deals with their dangerousness on that sort of continuum that you can look at. So I think that we should still – excuse me, I apologize. I think that with – So you're saying we need to do the historical analysis the same way that essentially Rahimi does. Is that right? I think the court needs to do the historical analysis, and I think when you look at the historical analysis, there is no strong analog to a machine gun. There's – talked about – Well, the question is not whether there's an analog to a machine gun. The question is whether there's an analog to, I think, to a ban on weapon types, right? I mean, this is an entire weapon type that's being banned, machine guns. Is there any founding era evidence in the colonies or wherever that certain guns or weapons were banned? There are references to even cases from – I couldn't find any, by the way. So I'm curious what the – I mean, until maybe 1830. A lot of it seems to touch on sort of the manner in which they were carried, perhaps. Afray talked about things from the 1300s and things like that. That seemed to be a lot of the focus is how they were carried versus just the fact that they were – But the court says, of course, that we don't – we're not looking for a twin. We're not looking for something that's dead ringer. We can kind of look at – in Rahimi, they looked at going armed statutes and also the surety laws to kind of cobble together something that looks like this prohibition. And I guess why wouldn't the same kind of thing apply here? Well, it's true. I don't think there would be an exact twin to a machine gun that was – in this case, it's dealing with a Glock switch. The switch itself, the actual item itself, is a violation of federal law. So there's not going to be an actual analog, I would say, as your Honor said. But I think when you have to look at – again, the test, I think, also is are they dangerous and unusual? I mean, I think that fairly to the other side, it would be shown that a machine gun can be dangerous. But when you're talking about is it an unusual weapon, the numbers have increased since – I think it was 1986 when machine guns were banned under the Firearms Control Act. And it seems the numbers have only gone up. The numbers are likely underreported based upon just people having switches, people not registering those with law enforcement or the ATF, as I think they're required to do. So I don't think that – So the rise of currently illegal machine guns shows that it's not unusual? Well, I mean, they can be – I mean, there's a lot of circularity here, I understand. They've been banned since 1986. So, I mean, I don't know. Nobody's – I mean, there's Grandfather Clause and other things. So I'm not sure that you can – the government can point to the lack of machine guns to support an unusual argument either. That's correct, Your Honor. But when you have to read them as conjunctively, since it says dangerous and unusual. Yeah, but Blackstone said – didn't Blackstone say dangerous or – I mean, I think there are a lot of sources that some say dangerous or unusual. Some say dangerous and unusual. It's unclear exactly how to read those. But, I mean, assume that it's – I know a couple of justices have said they're two independent requirements, so we'll assume that's right. But I guess I'm not totally convinced that that's correct. I think whether you look at them conjunctively or separately, I think it's not shown. Just dangerousness, okay, but has to – I think it also does have to be shown that it is an unusual weapon. And with the proliferation of these, it's – I think the government cannot meet that standard to show they're dangerous and unusual. So I think that, you know, as it applies here to – I mean, is that for every machine, everything that would fall under the definition in 922-0 – or not 922-0, but you know what I mean, the incorporated definition? Or are you talking about just this Glock with a switch? I think the definition under 5845 of the statute is so broad that almost anything, just pieces of things, can be deemed to be a machine gun. You know, the switch itself – But that would cover – I guess what I'm saying is the definition is so broad that it would cover things like heavy, like ship-mounted and plane-mounted, you know, automatic cannons or whatever that are clearly dangerous and unusual, I would think. I mean, that would doom the facial challenge, it seems to me. I mean, this particular small arm, I mean, those things aren't even bearable, so maybe they're not – they wouldn't even be protected. But this small arm, I don't know whether it's dangerous or unusual or and unusual is a more interesting question, I suppose. Yes, your – my time is up. Go ahead, please. I think that when you're looking at, as the court said, with this particular weapon in this case, it's not just how – it's not just the possession of it. Really, the dangerousness in this case came about because of the specific conduct. The weapon itself I don't think is shown to be dangerous. So we would stand on that. If there are no other questions, I will. All right, you all have your five minutes rebuttal. Thank you, Your Honor. Good morning. Good morning, Your Honors. Eileen Kuo for the United States. May it please the Court. The government submits that a machine gun, which can fire more than 1,000 rounds per minute and kill dozens of people within a matter of seconds, is a class of especially lethal weapons technology that falls well outside the type of weapon protected by the Second Amendment. I mean, these are highly destructive, sophisticated weapons, not contemplated for the purposes the Founding Fathers intended to serve by drafting the Second Amendment. And so for that reason, the government would submit that 922.0, prohibiting possession of unregistered machine guns, is constitutional, and the district court's order denying appellant's motion to dismiss should be affirmed. And to understand the dangerousness of a machine gun, we need to look no further than appellant Mr. Bridges' conduct in this case. So are you conceding that we need to do a historical analysis if you're talking about dangerousness? Well, Your Honor, the government would submit that we could stop at step one of the Bruin analysis because the government would still assert that a machine gun is the type of weapon that would— possessing a machine gun unregistered is the type of conduct that does not fall within the protection of the Second Amendment. But however, the government would also— I don't understand. What does that mean? It's not—the gun that he had in this case is a bearable arm that would fall within step one of Bruin, right? I mean— But the nature of the firearm is what makes it not the type of bearable arm contemplated by the Second Amendment and to— But you're saying the nature is it's dangerous. But my understanding was that that was part of Bruin step two. Am I wrong? It really goes to both, Your Honor. But if we look at the Hamblin case, in that case, this court held that the Second Amendment does not authorize unlicensed individuals to possess unregistered machine guns for personal use. And that puts that— Right, but Hamblin—so Hamblin—of course, if Hamblin applied, I think you would win. But Hamblin is relying on the dicta from Heller, and it's pre-Bruin and pre-Rahimi. And what we said in Williams is Bruin and Rahimi make it clear that we have to do a historical analysis. So we can't rely on pre-Bruin case law anymore. I mean, Williams says that very specifically. So don't you think we have to do a historical analysis? I would argue that the Bruin case does not displace the analysis in Hamblin, in that Bruin rejected only the means and scrutiny, which was not the analysis— Isn't that the test that we had applied in these cases that we said that we can no longer rely on is the interest-balancing test that the Supreme Court rejected in Bruin? Yes, and I would argue that it wasn't the interest-balancing that was— That was one of them. Maybe one of them, but also just— No, no, Hamblin did not do an interest-balancing analysis. It relied strictly on Heller. And therefore, I think there's a good argument that Hamblin is still binding precedent because it did not apply the test that was rejected in Bruin, and it's consistent with Heller, and Heller was deemed consistent with Bruin. So I guess I'm asking you, can we affirm— Does the government think we can affirm based upon Hamblin? Yes, Your Honor. The government would, but you could affirm on Heller and Hamblin. So then what do we do with the language in Williams? I mean, Williams dealt with the exact problem that, in Heller, the court had said they're presumptively good laws, and yet Williams reexamines that in light of Bruin with a historical analysis. So why doesn't that same logic apply in this case? I think we could and should do the historical analysis, and the government would submit that this law, 922-0, satisfies that second-step analysis as well. But I would note also that the analysis in Heller discussing the scope— But I'm confused. We have to follow Hamblin, or we do the historical analysis, right? I mean, what's your main argument, that Hamblin is still good law because it followed Heller and Bruin says that it's consistent with Heller? Is that your main argument? Yes, Your Honor. Okay. So secondarily, assuming that we did the historical analysis, do you have any historical analogs to this machine gun ban? Yes, Your Honor. What are they? So one example cited in our briefs is the regulation of gunpowder, and this was something in the early 1800s and late 1700s where there were anecdotally examples of times where people possessing large amounts of gunpowder had accidentally or otherwise caused mass damage. And for that reason, various cities regulated the amount of gunpowder. But that was like a fire code. Like you can't have mass quantities of gunpowder because you might blow the town up. I mean, that doesn't seem like— Do we have any analogs where somebody is banning small arms? I think another analog would be in early Tennessee law banning concealed Bowie knives or Arkansas toothpicks. But those are all post-founding, aren't they? They are, but it goes to the historical tradition of regulating a type of firearm or a class of firearm. And in that example, that law made it unlawful to possess a concealed Bowie knife for the purpose of any purpose, whether it be self-defense or to attack somebody. And in that, there's a case, Day v. State, out of the Tennessee Supreme Court in 1857, analyzing that balancing between the right of self-defense, which is not denied, but the court held in that case that although a person may have the right to self-defense, they don't have the right to do that with that type of weapon. But I mean, again, that's getting pretty far. I mean, my understanding is this machine gun ban is the first ban of any type of small arm by the federal government. Like, there were 200 years of the federal government not banning anything until this machine gun ban in 1986. I mean, that's fairly powerful evidence that there is no tradition of at least the federal government banning anything. Well, and as the court noted, under Rahimi, we don't need to point to an exact historical twin. And what's tricky here is that... Yeah, but I don't even see a sibling here. I mean, I don't... Even if we're looking for something close. And what's tricky here is that weapons technology has come a long way since the time of the founding. And there wasn't a type of weapon that could fire this many bullets with one pull of a trigger back then, and there wasn't a weapon that you could hold in your hand that could cause that much damage back then. And so it's hard to find something closer than what we're able to point to now. But if we look at the regulation of the amount of gunpowder you could have or the concealed possession of Bowie knives, I think there are historical analogs where we can see that there is a historical tradition of regulating the type of weapon and the class of weapon and not just the status of the person possessing it. And those would be the closest ones that we can point to at this time, but it shows that even though the Founding Fathers couldn't have contemplated a machine gun or what to do with one, here now, when we're analysing that issue, we have to look to the technology and what was around at the time. And we do see examples of regulating possession of things that can cause large amounts of destruction. And even to go back to the analysis in Heller as to what the scope of the Second Amendment is, the Heller court analysed it in terms of comparing it with the prefatory clause of the Second Amendment, a well-regulated militia being necessary to the security of a free state, analysed what that right is and how that translates to an individual right, and of course that court held that that includes the right to self-defence, but that right is not unlimited. And part of the analysis was that the Second Amendment protects the right to possess weapons typically used by law-abiding citizens for lawful purposes. And what we have here is a weapon that is not typically possessed by law-abiding citizens for lawful purposes. And earlier there was a discussion that's... So by definition, a law-abiding citizen doesn't own one. Exactly, and so the rising numbers... So that's just circular. I mean, I don't know how we can analyse it with that. Well, and Congress... With the existing ban in place. Right, and we can look to Congress's reasoning for doing that, which is that they noted early on that this was a type of weapon typically used by bootleggers and criminals for unlawful purposes and was unpopular, actually, with civilians and law enforcement. There's a House resolution noting that the proliferation of machine guns undermines the protection of law enforcement officers, which is very similar to the facts of the case we have here, which is that the existence of this machine gun undermined the ability of the law enforcement officer in this case to do his job. As noted, the conduct in this case, Mr Bridges had a Glock with a switch in it in his car and he was driving down the interstate and a Shelby County Sheriff deputy cut on his blue lights to get his attention because he was driving erratically. Mr Bridges then pointed this gun out of his car window and sprayed bullets onto this busy highway during rush hour. Several of these bullets hit the Shelby County Sheriff deputy's car and one of them came within inches of his head and was lodged in the door frame of the driver's side door. So it's because of cases like this and others that Congress enacted this law, making it unlawful to manufacture, transfer, and possess more machine guns past 1986. I take it that he violated all kinds of laws aside from possession of a machine gun. But it goes to show that this possession is not... He might have even violated a medieval going armed at night law. That would be the way that you would get it, the conduct, as opposed to a law that covers possession in your home. This law covers I can't even have a machine gun in my house. I can't go armed or carry it outside, but I can't own it in my house either. You wouldn't be able to have one that's unregistered if you weren't able to apply for and receive the license to own a machine gun, which is consistent with the historical tradition of regulating highly dangerous weapons and is consistent with the purpose of the Second Amendment, which is to arm the people to protect themselves and to be able to maintain a well-regulated militia, which does not include the right to possess military technology or wartime weapons capable of causing mass casualty or wide destruction. The right to bear arms comes out of the right for citizens to defend themselves and to protect the free state. That purpose came out of a fear by the Founding Fathers that a government might try to disarm its citizens and rule by force rather than by democracy. If democracy were under threat, people would be able to... If my government is trying to rule me by force, I'd rather have a machine gun than a semi-automatic pistol to protect myself. The Heller Court did address this as well, which is that even though technology, weapons technology, has advanced since then, that doesn't mean the common citizen should have the right to possess a tank or a grenade launcher, even though such things would be more effective against a warring country now, but that's not what a common citizen is doing. They're not part of an organized military. A militia is meant to be people being able to grab whatever weapons they have on hand for lawful purposes that they already have, lawful purposes being self-defense, defense of their person, defense of their home, or hunting, other lawful purposes like that, but that does not include the right to go on the offensive and to wage war and to cause mass casualty and to cause wide destruction. And the Heller Court noted that the fact that modern-day developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of that right and their interpretation of that right is that the arms meant by the Second Amendment does not include military weapons, does not include the weapons that would be used by armies or organized militaries. It's something that would already be owned in the home for self-defense and would not include weapons that would be dangerous and unusual, and noted specifically that it would be startling to accept an interpretation of the Second Amendment that would restrict possession, that the Second Amendment would, that it would be unconstitutional to restrict possession of machine guns. So for that reason, regulating machine gun possession is constitutional because there's not a constitutional right to possess wartime technology by the common citizen unregistered and as an unlicensed person. And if there are no other... Any further questions? Judge Box?  All right. Thank you, Your Honor. Thank you, counsel. Rebuttal? Just a couple of additional comments. The defendant, Mr. Bridges, I would say, as Judge Nalbandian said, has covered, he's one of the people in this situation. He was, I think, 18 years old. He had not been convicted of a felony. It is a bearable arm. It's a small arm. It's not a tank or an aircraft-mounted gun or something like that. It is a small arm. The only difference between that and typical Glock is it has this switch attached to it. That is the only difference as far as it's still a small arm. It can fire more bullets. That's true. I would also... What Ms. Kuo said about some of his conduct, and it's contained in the pre-sentence report, some of the facts that he did not realize that initially it was an officer. I think the officer actually was off-duty at the time. He fired these weapons. He told officers who were investigating that he thought that he was under attack by somebody. He had gotten into some sort of dispute on the interstate, and somebody had fired at him. He fired back. So when it's an allegation that he is just, you know, unrepentantly firing at law enforcement, I don't think that's borne out by the record. So I just want that to be clear. That probably would pertain more to our as-applied challenge, but I think it does have some bearing on what we're talking about. And also we're talking about, as Ms. Kuo said, the highly sophisticated nature of these weapons. This is a device you can essentially buy, I think, off the Internet through any number of purveyors. You can buy them made by a 3-D printer. They're made of metal. It's not a highly sophisticated piece of technology. It is just a little clip that you can put on the end of the weapon. So, again, showing that that itself is dangerous and unusual I don't think is borne out by the facts of this particular case. And so we would, again, ask the court to find that Judge Foulkes erred in his order where he said that Mr. Bridges could not lawfully possess a handgun and that 922-0 was not unlawfully applied to him. Okay. Thank you for your arguments. The case will be submitted.